UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BATTERY HANDLING SYSTEMS, INC., | ) |
| Plaintiff, | ) |
| vs. | ) No. 4:14-cv-00782 |
| JAMES D. STONEMAN, et al., | ) |
| Defendant. | ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff Battery Handling Systems Inc. ("BHS") has moved this Court for a temporary restraining order against its former employee, Defendant James D. Stoneman, and his new employer, Defendant Materials Transportation Company ("MTC"). Mr. Stoneman owes BHS contractual non-disclosure, non-solicitation, and non-competition obligations for another sixteen months. MTC is one of only three direct competitors of BHS, in the entire United States. Mr. Stoneman took the job with MTC and MTC, in turn, hired Mr. Stoneman, knowing that such employment would constitute a violation of Mr. Stoneman's contractual obligations.

As a result of the misrepresentations made by Defendants Stoneman, MTC and MTC's President, Defendant Granfor, BHS is back in this Court for the second time in a month seeking this same relief. On March 27, 2014, BHS filed a similar action when it originally learned that Defendant Stoneman had gone to work for BHS's direct competitor, MTC, in knowing violation of his non-disclosure, non-solicitation, and non-competition obligations. On the eve of the temporary restraining order ("TRO") hearing, Defendant Stoneman, MTC and MTC's President, Defendant Granfor, represented to BHS that Defendant Stoneman was no longer employed by MTC. Based on these representations, which provided the relief that BHS sought, BHS dropped its request for a TRO and thereafter voluntarily dismissed its action. Less than a month later, on

April 18, 2014, BHS learned that Defendant Stoneman was still employed by MTC and that the representations that had been made were false. Due to the defendants' false representations and continuing misconduct, BHS is now back in this Court seeking relief needed to avoid suffering irreparable harm. BHS has and will continue to suffer immediate, substantial and irreparable harm as a result of Mr. Stoneman's and MTC's actions and misrepresentations, unless this Court enters a temporary restraining order.

## ARGUMENT

This Court should grant BHS's motion for temporary restraining order because, as discussed below, BHS has established (1) a likelihood of success on the merits; (2) an immediate threat of irreparable injury to BHS; (3) that the threat of irreparable harm to BHS grossly outweighs the injury, if any, that granting the injunction might inflict on Mr. Stoneman and MTC; and (4) that the injunction would not be contrary to the public interest. *See, e.g., Dataphase Sys. Inc. v. CL Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981).

**I.   BHS should succeed on the merits.**

An "employer needs to be able to engage a highly trained workforce to be competitive and profitable, without fear that the employee will use the employer's business secrets against it or steal the employer's customers after leaving employment." *Healthcare Services of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 609 (Mo. 2006). In light of this necessity, the Missouri courts routinely enforce non-compete agreements, so long as (1) the agreement is being used to protect a legitimate business interest; (2) the contractual limitation are reasonable in both geographic and temporal scope; and (3) the employee received adequate consideration for the agreement. *See, Id*.

As discussed below, the non-compete agreement at issue more than meets these standards. BHS is protecting multiple, legitimate business interests through the non-disclosure,

non-solicitation and non-compete obligations at issue. Given the specialized nature of the battery handling system industry, the nation-wide focus of Mr. Stoneman's position as National Account Manager for BHS, and the long-term, confidential marketing, branding and sales strategies that Mr. Stoneman knows intimately and helped to develop, the three year limitation on competing against BHS in North America and Hawaii is reasonable. Mr. Stoneman also received more than adequate consideration in exchange for these obligations, as he was one of the top three most highly compensated employees during his time at BHS.

### A. The restrictions are necessary to protect BHS's legitimate business interests.

BHS is seeking to protect two legitimate business interests through the enforcements of Mr. Stoneman's non-disclosure, non-solicitation and non-compete obligations: (1) the long-term, nationwide, written marketing, branding and sales strategies that BHS, and Mr. Stoneman, spent significant time and resources to develop; and (2) the target customer lists, customer contacts and good will that BHS and Mr. Stoneman developed in executing that strategy.

In determining whether the information at issue constitutes a "legitimate business interest," the courts typically will consider six factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort of money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id*. at 611.

The Missouri courts routinely have recognized that confidential customer lists and customer contacts meet the standards established by these factors. *See e.g., Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. banc 1985) (express agreements not to compete may be

enforced as to employees having substantial customer contacts, and to prohibit disclosure of customer lists, even if they are not secret). The Missouri courts also have found that an employee's knowledge of business production processes and methods; product pricing and quantity information; how a business matches products to particular customers; and details of the employer's business operations, employee performances and lists of potential customers, also were legitimate business interests that should be protected under the analysis above. *See Cape Mobile Home Mart, Inc. v. Mobley*, 780 S.W.2d 116 (Mo. App. 1989); *Sigma Chemical Co. v. Harris*, 586 F. Supp. 704 (E.D. Mo. 1984); *Ultra-Life Laboratories, Inc. v. Eames*, 221 S.W.2d 224 (1949).

Mr. Stoneman, in his position as National Account Manager, assisted BHS with identifying the large, nationwide businesses that would be the best targets for BHS products and services, and then developing the marketing, branding and sales strategies and programs that would enable BHS to develop business with those target customers. (Plaintiff's Verified Complaint ("VC"), ¶¶ 19, 24, 38). The target customer list was not simply a print-out of the Fortune 500 list, or something pulled from a phone-book. BHS, with the assistance of Mr. Stoneman, spent numerous meetings identifying the particular attributes that differentiated BHS's products and services from those of its competitors, and the key, large businesses that would be most likely to see the value in those attributes. (VC, ¶ 38).

The marketing, branding and sales strategies also consisted of more than simple discussions of sales techniques. BHS was and is well aware that, in order to succeed in the highly competitive battery handling market, it needed to develop marketing, branding and sales strategies that differentiated it from its competitors. (VC, ¶ 24). BHS, with the assistance of Mr. Stoneman, spent more than a year developing detailed, written policies, programs, and strategies

that it would use to generate business relationships with the national, target customers and grow those relationships. (VC, ¶¶ 19, 24, 38). These strategies and programs included and continue to include unique ways to approach and secure sales rights with the large businesses, as well as unique uses of BHS's dealer network to service the customers on a national level. (VC, ¶¶ 24, 38).

Mr. Stoneman also was primarily responsible for using the target customer list, and executing the strategies that he had helped to develop. (VC, ¶ 19, 38). This specifically included establishing contacts with all of the target companies, and compiling the contact lists and notes that BHS could use to continue developing the business relationship with the new customers. (VC, ¶¶ 19, 38). Over the course of Mr. Stoneman's employment with BHS, he participated in, sent and/or handled more than 3,000 internal and external meetings, calls, communications, training sessions and visits for the purpose of developing and implementing these strategies. (VC, ¶ 39).

BHS has done everything possible to ensure the secrecy of this information, because it is exactly the kind of information that, if obtained by BHS's competitors, would allow them to effectively and unfairly counteract the strategies and destroy the year-plus worth of effort expended in putting those strategies together. (VC, ¶ 41). BHS does not permit these programs, policies, written strategies, target customer lists, and contact lists to be distributed to anyone outside of BHS, and includes a duty in all employee contracts to not disclose the information to any third-party, as well as a duty to return all such information in possession of an employee, upon leaving BHS. (VC, ¶ 22). BHS also limits the distribution of these programs, policies, written strategies, target customer lists, and contact lists within BHS to only those employees that need it in order to perform their job duties. (VC, ¶ 23). No competitor of BHS uses the

5

same strategies or has access to the lists that BHS has developed, and, absent being handed this information by a former BHS employee, no competitor could easily re-create the programs or the lists. (VC, ¶ 24-25).

Given BHS's development efforts, the uniqueness of the final product, the secrecy with which BHS maintains the product, and the significant value to BHS's ongoing operations, the marketing, branding and sales strategies, the target customer lists, and the customer contact lists at issue are exactly the type of information that constitute a "legitimate business interest" that it is necessary to protect through non-disclosure, non-solicitation and non-compete covenants.

### B. The geographical and temporal limitations are appropriately tailored.

The reasonableness of the geographical and temporal limitations in a non-compete agreement requires a thorough consideration of all surrounding circumstances, including the subject matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint, and the specialization of the business. *Reed, Roberts Associates, Inc. v. Bailenson*, 537 S.W.2d 238, 241 (Mo. App. 1976).

Mr. Stoneman's non-compete requirements cover the geographical area of North America and Hawaii, for a period of three years. Both limitations are logical and reasonable in light of the circumstances, particularly given the willful and knowing violations of those restrictions by Mr. Stoneman and MTC.

#### 1. The geographic limitations are reasonable.

Missouri courts have enforced both worldwide and nationwide geographical limitations. *See Hulsenbusch v. Davidson Rubber Co.*, 344 F.2d 730, 732 (8th Cir. 1956) (enforcing a nation-wide limitation); *Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239, 243 (Mo. App. 1993); *Sigma Chemical Co.*, 586 F. Supp. at 710 (enforcing a world-wide limitation). These types of geographic limitation are enforced, when they match the geographic scope of the business at

issue and the employees' responsibilities while employed by that business. *Sigma Chemical Co.*, 586 F. Supp. at 710. For example, in Sigma, the court found that the worldwide limitation was appropriate because the plaintiff business operated worldwide. *Id*.

BHS actually operates worldwide, but the geographic restriction in Mr. Stoneman's non-compete is limited only to North America and Hawaii. (VC, ¶¶ 8, 31). This is because Mr. Stoneman's work on behalf of BHS was focused on the entire market of North America and Hawaii. (VC, ¶ 15). Mr. Stoneman was not employed to address marketing or sales issues on a local or even regional level. (VC, ¶18). Local and regional markets were left to other employees and dealers associated with BHS. (VC, ¶ 18). As discussed above, Mr. Stoneman was the National Account Manager for BHS, and was charged with targeting national businesses and implementing a national strategy for marketing, branding and sales. (VC, ¶¶ 18, 19, 24, 38). The national focus of Mr. Stoneman's position, knowledge and contact base, and the extremely small number of competitors in the applicable market, makes the geographical limitation of his covenant not to compete both logical and reasonable.

### 2. The temporal limitations also are reasonable.

Missouri courts also have regularly enforced covenants not to compete of three years or more. *See Watlow Electric Manufacturing, Co. v. Wrob*, 899 S.W.2d 585 (Mo. App. 1995) (enforcing a five-year non-compete); *Shelbina Veterinary Clinic v. Holthaus*, D.V.M., 892 S.W.2d 803 (Mo. App. 1995) (enforcing a four-year non-compete); *Herrington v. Hall*, 624 S.W.2d 148 (Mo. App. 1981) (enforcing a three-year non-compete); *Reed Roberts Associates, Inc. v. Bailenson*, 537 S.W.2d 238 (Mo. App. 1976) (enforcing a three-year non-compete); *House of Tools and Engineering, Inc. v. Price*, 504 S.W.2d 157 (Mo. App. 1973) (enforcing a three year non-compete); *R.E. Harrington, Inc. v. Frick*, 428 S.W.2d 945 (Mo. App. 1968) (enforcing a three-year non-compete).

In determining whether the duration is appropriate, the courts have not only looked to the traditional reasonableness factors, but also to the behavior of the employee that led to the necessity for enforcement of that restriction. *See e.g. Wrob*, 899 S.W.2d at 588; *Frick*, 428 S.W.2d at 950. In *Wrob*, the court specifically noted that the employees' "intentional, willful and wrongful conduct" designed to "gain an unfair advantage in the marketplace" was a factor in determining that a five-year non-compete restriction was authorized. *Wrob*, 899 S.W.2d at 588. In *Frick*, the court also specifically noted that the fact the former employees conspired to compete with its former employer and had already contacted former customers in an effort to do so, was a factor in upholding the three-year non-compete. *Frick*, 428 S.W.2d at 950.

Mr. Stoneman's non-compete was to last for three years after his employment agreement was terminated. (VC, ¶ 31). The three year restriction is both logical and reasonable in light of the legitimate business interests that BHS is seeking to protect. The proprietary marketing, branding and sales strategies that Mr. Stoneman helped BHS develop over the course of a year were long-term plans are still implemented to date by BHS, and will continue to be implemented by BHS well into and through 2015. (VC, ¶ 27). The target customer lists and customer contacts that Mr. Stoneman helped BHS to develop also continue to be used by BHS and will continue to be used by BHS well into and through 2015. (VC, ¶ 27).

Mr. Stoneman's behavior also is a factor that weighs heavily in favor of enforcing the three-year restriction. Mr. Stoneman knew that taking this job, with **one of only three BHS direct competitors in the entire United States**, would violate his obligations and would lead to legal action. (VC, ¶ 13). When Mr. Stoneman voluntarily resigned his position with BHS, he stated that he would "comply with the 3 year non-compete [he] signed, and, even more, indicated that he "would NEVER join the ranks of any other battery handling company, ever!" (VC, ¶ 43).

8

And, he acknowledged that MTC was one of those competitors, when he subsequently contacted BHS to confirm that his employment with Nacco Industries would not violate his obligations, even though Nacco sold MTC products. (VC, ¶ 49).

Yet, less than 18 months into his 3 year non-compete, Mr. Stoneman violated his obligations under his employment agreement, by taking a job with MTC. (VC, ¶¶ 42, 53). He did not contact BHS to discuss whether this was a violation because it knew it was. (VC, ¶ 57). He indicated in subsequent conversations with BHS that, at the time he took the job, he was aware he likely would be sued for the violations, yet he decided to roll the dice and take the job anyway. (VC, ¶ 57).

Even worse, after BHS filed exactly the lawsuit that Mr. Stoneman expected, Mr. Stoneman, MTC and MTC's President, Jim Granfor, all represented to BHS that Mr. Stoneman had been terminated from the position. (VC, ¶¶ 63-69). It was more than a month after BHS relied on these representations and dismissed the action without prejudice that BHS discovered the representations were false and that Mr. Stoneman was still employed by MTC and continuing to assist MTC in unfairly competing with BHS. (VC, ¶¶ 70-74).

Based on the rational relationship between the legitimate business interests that BHS seeks to protect and the three-year duration of the non-compete, and Mr. Stoneman's willful and knowing violation of that obligations, the temporal limitation should be deemed more than reasonable.

C. **Mr. Stoneman received more than adequate consideration.**

Under Missouri law, the promise to employ or continue employing an at-will employee, is deemed adequate consideration for a covenant not to compete. *Bailenson*, 537 S.W.2d 238, 241. The non-disclosure, non-solicitation and non-compete requirements, here, all were a part of Mr. Stoneman's original employment agreement, and were a condition of BHS agreeing to hire

9

him as National Account Manager. (VC, ¶¶ 29-32).

The employment agreement more than fairly compensated Mr. Stoneman for his services and the non-compete agreement. (VC, ¶17). Mr. Stoneman earned an annual base salary of $90,000. (VC, ¶ 17). That base salary was supplemented by a bonus program that could increase his salary up to $107,000, annually. (VC, ¶ 17). Over the course of Mr. Stoneman's employment with BHS, his actual annual salary was, on average, $96,000 per year. (VC, ¶ 17). This made Mr. Stoneman the third-most highly compensated employee of BHS, out of more than sixty total employees. (VC, ¶ 17).

There is no question that sufficient consideration existed here.

## II. There is an immediate threat that BHS will be irreparably injured.

Mr. Stoneman's employment by MTC represents the worst possible scenario for BHS and exactly what the non-disclosure, non-solicitation and non-compete obligations were designed to protect against.

As discussed at length, above, Mr. Stoneman has intimate knowledge and was heavily involved in designing proprietary, unique and confidential written marketing, branding and sales strategies that were aimed directly at BHS's largest customers and largest potential customers. Mr. Stoneman also has knowledge regarding BHS's target customer lists (including how that list was compiled) and has customer contacts at the national level that were developed on behalf of BHS.

If Mr. Stoneman is allowed to give MTC access to this information, it will result in unfair competition. MTC will know exactly the strategies that BHS is using to compete in the industry and will have all of the information it needs to counteract those strategies that BHS spent considerable time developing. (VC, ¶ 76). If MTC is simply allowed to steal BHS's national, customer contacts, by hiring key former BHS employees, it will destroy the value of those

contacts generated through significant time and money spent developing them. (VC, ¶ 76). If MTC is allowed to buy BHS's national, customer target list, it will permit MTC to know exactly which businesses it should target to ensure that BHS cannot grow. (VC, ¶ 76).

These are exactly the types of unfair competition against which non-compete agreements are designed to protect, and exactly the type of irreparable and difficult to calculate harms for which temporary restraining orders were designed.

### III. The injury to BHS far outweighs any potential injury to Stoneman and MTC.

Inconvenience and temporary financial loss to an employee are outweighed by the court's concern "with the importance of requiring those who solemnly assume contractual obligations, to observe and fulfill them." *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo. banc 1985).

Here, Mr. Stoneman will suffer nothing more than that – inconvenience and a temporary financial loss. Mr. Stoneman is not an individual that is so specialized in a particular industry that he cannot find other employment. Before coming to BHS, Mr. Stoneman had no experience in the battery handling industry, and instead worked in the much broader materials handling industry. (VC, ¶ 14). When he voluntarily left BHS, it was to explore a new opportunity in the field of insurance sales, with Colonial Life Insurance Company. (VC, ¶ 44). After Mr. Stoneman left BHS, and before being employed by MTC, Mr. Stoneman worked for another company in the broader materials handling industry – Nacco Industries, Inc. (VC, ¶49). While the battery handling industry in the United States consists of 4 companies competing for $55 to $60 million in annual revenue, the material handling industry consists of hundreds of thousands of potential employers generating almost $100 Billion in revenue annually. (VC, ¶¶ 8-11).

Mr. Stoneman has shown both the aptitude and the ability to obtain lucrative employment with any number of businesses that do not compete directly with BHS, and enforcing the non-compete agreement against him will not keep him from finding such further employment in the

future.

It is even more obvious that MTC will suffer nothing more than inconvenience, if it is required to go without the services of Defendant Stoneman. MTC already purported to terminate Mr. Stoneman's employment once, when this same relief was requested previously. (VC, ¶¶ 65-68). This action indicated not only a lack of hardship that would be suffered by MTC, but further evidenced the lack of hardship that MTC believed would be suffered by Mr. Stoneman.

## IV. Entry of a Temporary Restraining Order is appropriate.

BHS's motion for temporary restraining order and associated proposed fully set forth the specific elements of the relief requested. In summary, however, for those reasons, discussed above, Mr. Stoneman believes that his motion should be granted, and that a temporary restraining order requiring Mr. Stoneman to abide by his contractual obligations until such time as a preliminary injunction hearing can be held is appropriate.

Respectfully submitted,

By: /s/ Jonathan D. Valentino
Jonathan D. Valentino, #56166MO
Jeffrey L. Schultz, #56553MO
Attorneys for Plaintiff
BATTERY HANDLING SYSTEMS, INC.,
Armstrong Teasdale LLP
7700 Forsyth Blvd., Suite 1800
St. Louis, Missouri 63105
Telephone: 314.621.5070
Fax: 314.621.5065
jvalentino@armstrongteasdale.com
jschultz@armstrongteasdale.com